

U.S. Department of Justice

Criminal Division

*Fraud Section*  1400 New York Avenue NW
Washington, D.C. 20530

September 12, 2023

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Corey Flaum
                  Criminal Docket No. 19 CR 338 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for September 19, 2023, at 9:00 a.m. On July 25, 2019, the defendant pleaded guilty, pursuant to a plea agreement, to an information charging him with one count of attempted price manipulation, in violation of 7 U.S.C. § 13(a)(2). See ECF No. 2. For the reasons stated herein, the government respectfully moves the Court pursuant to U.S.S.G. § 5K1.1 to depart downward significantly from the advisory United States Sentencing Guidelines (U.S.S.G.) range and to impose a non-incarcerative sentence that reflects Mr. Flaum's immediate and significant cooperation, which involved testimony at trial and resulted in a landmark corporate resolution.

I.    Background

    A.    Offense Conduct

      The defendant was a precious metals trader in New York at Bear Stearns and, after that bank's collapse in mid-2008, at The Bank of Nova Scotia (Scotiabank). His conviction in this case relates to the unlawful trading of precious metals futures contracts on exchanges operated by the CME Group, Inc. (CME) in Chicago, Illinois.[1] From approximately June 2007 to approximately July 2016, the defendant manipulated the prices of precious metals futures contracts by placing orders into the market with no intent to actually execute those orders—a practice known

---

[1] The CME operates the world's largest financial derivatives exchange. A futures contract, which is a type of derivative, is a legally binding agreement to buy or sell an asset at a later date. Precious metals futures contracts are futures contracts for the purchase and sale of certain metals, including gold, silver, platinum, and palladium.

as "spoofing." See 7 U.S.C. § 6c(a)(5)(C). The spoof orders injected false information regarding supply and demand into the market and induced other traders to react to that influx of false information, allowing the defendant to profit from the resulting changes in market conditions and price movements.

The spoofing scheme worked as follows: (Step 1) if the defendant wanted to purchase a gold futures contract (for example), he placed an order to buy. Then (Step 2), to facilitate the execution of the buy order, on the opposite side of the market he placed one or more fully visible orders to sell, sometimes at different price levels. These were spoof orders. The purpose of the sell orders was not to sell; it was to create the illusion of supply—i.e., to make other market participants believe (falsely) that there was genuine, sizable selling interest in the market. Next (Step 3), other market participants reacted to the defendant's spoof sell orders by also placing sell orders, which had the effect of pushing market prices down, toward where the defendant's buy order was waiting to be executed. Finally (Step 4), once the defendant's buy order was filled, he quickly canceled his sell orders to avoid them being filled. The spoof orders were designed to, and at times did, move the price of precious metals futures contracts in a direction that was favorable to the defendant. The spoofing by Mr. Flaum on Scotiabank's precious metals desk worked, generating profits for the desk and, in total, causing approximately $3.35 million in calculable losses to hundreds of victims between 2008 and 2016.

B. Procedural History

The government's investigation of manipulative trading by members of Scotiabank's precious metals desk began in early 2019. On May 30, 2019, two FBI agents approached Mr. Flaum at his home in (at that time) Syosset, New York to question him about his spoofing while a precious metals trader. Mr. Flaum immediately and candidly admitted that he spoofed while working at Bear Stearns and Scotiabank. A few weeks later, Mr. Flaum met with government to provide additional information regarding spoofing by him and others. Less than two months after being approached by the FBI agents, on July 25, 2019, Mr. Flaum pleaded guilty. Following his guilty plea, Mr. Flaum met with the government approximately ten times over the course of three years and provided information related to spoofing that occurred at Bear Stearns and Scotiabank.

The information that Mr. Flaum provided as part of his cooperation advanced the government's investigation and prosecution in two distinct matters. First, in August 2020, just 15 months after the FBI agents approached Mr. Flaum, Scotiabank entered into a significant corporate resolution with the government involving a deferred prosecution agreement (DPA), the imposition of a corporate compliance monitor, and the payment of $60.4 million in fines, forfeiture, and restitution.[2] See DPA, United States v. The Bank of Nova Scotia, 20 CR 707, ECF No. 2 (D.N.J. Aug. 19, 2020). Second, Mr. Flaum testified at a trial against Gregg Smith and Jeffrey Ruffo, former colleagues on the precious metals desk at Bear Stearns, and Michael Nowak, who worked with Mr. Smith and Mr. Ruffo later at JPMorgan. See United States v. Smith, 19 CR 669 (N.D.

---

[2] The DPA with Scotiabank encompassed spoofing by Mr. Flaum as well as three other members of Scotiabank's precious metals desk, including traders on Scotiabank's precious metals desks in London and Hong Kong.

Ill.). On August 10, 2022, after a five-week trial in Chicago, a jury convicted Mr. Smith and Mr. Nowak of commodities fraud, spoofing, attempted commodities price manipulation, and multiple counts of wire fraud affecting a financial institution, arising from their manipulative trading on JPMorgan's precious metals desk. At that trial, Mr. Flaum testified over the course of two days. In the government's view, Mr. Flaum's testimony was an important part of the government's case and contributed to securing the convictions of Mr. Smith and Mr. Nowak on every substantive count in their indictment—wire fraud, commodities fraud, attempted price manipulation, and spoofing.[3]

II.      Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the Addendum to the Presentence Report, dated July 19, 2023, specifically:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Loss of More Than $1,500,000 (§ 2B1.1(b)(1)(L)) | +16 |
| Offense Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Acceptance of Responsibility (§ 3E1.1(a)-(b)) | -3 |
| Total Offense Level: | 23 |

Accordingly, based on a total offense level of 23, and the defendant being in Criminal History Category I, the government submits that the advisory Guidelines range is 46 to 57 months' imprisonment and a fine of between $20,000 and $200,000.

In addition, the Court may wish to consider a downward variance from this range based on a newly approved amendment to the Guidelines, unless it is rejected by Congress, which will take effect (as relevant to Mr. Flaum) on February 1, 2024, since he is being sentenced prior to November 1, 2023. More specifically, the newly approved U.S.S.G. § 4C1.1 provides for a two-level decrease in a defendant's offense level for so-called "zero-point offenders," that is, defendants who have zero criminal history points and meet nine other criteria. Mr. Flaum meets all of these criteria. Of course, this Court is required to apply the version of the Guidelines in effect at the time of sentencing. See 18 U.S.C. 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). Unless Congress provides otherwise, a proposed Guidelines amendment takes effect only after a prescribed period of congressional review has elapsed. See 28 U.S.C. 994(p); Stinson v. United States, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). In this instance, absent Congressional action, the amendment for "zero-point offenders" will not take effect until November 1, 2023. Further, the U.S. Sentencing Commission has voted to delay the retroactive implementation of § 4C1.1 for defendants sentenced before November 1, 2023, by three months (i.e., until February 1, 2024). If the Court is inclined, therefore, to consider the 2-level reduction before it takes effect and becomes retroactive, the Court must calculate the Guidelines range under the current version of the Guidelines first. Then, if it wishes, the Court may vary downward in

---

[3] Mr. Nowak and Mr. Smith were acquitted on two conspiracy charges, as was Mr. Ruffo, who was only charged in the two conspiracy counts.

light of the proposed amendment to a total offense level of 21, with a corresponding Guidelines range of 37 to 46 months imprisonment and a fine of between $15,000 and $150,000. If the Court varies downward, the government respectfully requests that the Court clearly state that the variance is because of the amendment so that the defendant will not receive a further reduction when the retroactive implementation of the amendment for defendants sentenced before November 1, 2023 becomes effective on February 1, 2024.

III. Motion for Downward Departure Pursuant to U.S.S.G. § 5K1.1

The government respectfully moves the Court to depart downward pursuant to § 5K1.1. Mr. Flaum has provided substantial assistance that led to a significant corporate case against Scotiabank and the prosecution and conviction of two precious metals traders in the Smith case. Section 5K1.1 of the Guidelines authorizes the Court to depart downward from the applicable Guidelines range upon the government's motion and provides that the extent of the reduction may be based on "(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; [and] (5) the timeliness of the defendant's assistance." U.S.S.G. § 5K1.1(a). The government respectfully submits that these considerations support a significant downward departure here.

First, Mr. Flaum met with the government approximately ten times over the course of three years, and his cooperation significantly advanced the government's investigation into spoofing on Scotiabank's precious metals desk. Mr. Flaum's cooperation was an essential factor in the government's resolution of its corporate case against Scotiabank in August 2020, which resulted in a deferred prosecution agreement that included the imposition of a corporate compliance monitor together with the payment of $60.4 million in fines, forfeiture, and victim compensation payments. Further, the fact that only 15 months transpired between Mr. Flaum's guilty plea and the corporate resolution with Scotiabank is a testament to Mr. Flaum's immediate and complete cooperation with the government.

Mr. Flaum also provided first-hand information from his experience trading and spoofing at Bear Stearns, and, in particular, working with, and learning to spoof from, Mr. Smith. Mr. Flaum described how he learned to spoof by watching Mr. Smith's own spoofing while Mr. Flaum sat next to Mr. Smith on the trading desk at Bear Stearns. In addition, at trial last summer in the Smith case, Mr. Flaum was a key witness for the government, and in the government's view, an important factor in the convictions of Mr. Smith and Mr. Nowak. Mr. Flaum testified over the course of two days and was subject to cross-examination by multiple defense attorneys. While the Smith case focused on the defendants' spoofing while on the precious metals desk at JPMorgan, the spoofing by Mr. Smith, the lead defendant, while he was at Bear Stearns was also part of the offense conduct at issue at trial. Mr. Flaum was one of three cooperating witnesses that testified on behalf of the government in the Smith case. The other two cooperating witnesses (John Edmonds and Christian Trunz) were more junior traders that worked with the defendants for several years on JPMorgan's precious metals desk. While Mr. Flaum's testimony was limited to a narrower period of time relating to Mr. Smith's trading at Bear Stearns, that did not reduce the value of Mr. Flaum's testimony at the trial. Of the three cooperators, only

Mr. Flaum and Mr. Trunz worked with Mr. Smith at Bear Stearns; as such, Mr. Flaum's testimony provided important corroboration of Mr. Trunz. Mr. Flaum's credible testimony and his demeanor, especially during cross-examination, made a difference in the outcome of the trial. For all of these reasons, in the government's estimation, Mr. Flaum was an important witness.

Second, the information and testimony provided by Mr. Flaum was truthful, complete, and reliable. After his immediate decision to accept responsibility and cooperate, Mr. Flaum was forthcoming and did not minimize his conduct, but also never conformed his information or testimony to what he believed the government wanted to hear. The reliability of his information is shown, and affirmed, by the fact that Scotiabank admitted to the relevant criminal conduct and a jury convicted Mr. Smith.

Third, the nature and extent of Mr. Flaum's assistance over three years involved several lengthy interviews, the review of charts showing spoofing activity by himself as well as other traders, the interpretation of trader jargon contained in electronic communications, and two days of trial testimony. Mr. Flaum's cooperation also extended for an unusually long duration (lengthened by trial delays in the Smith case caused by the coronavirus pandemic), but Mr. Flaum cooperated for years without issue where other witnesses might have expressed frustration at the delay.

Finally, Mr. Flaum's cooperation was immediate. From the moment the FBI agents knocked on his door, Mr. Flaum candidly acknowledged his unlawful trading at Bear Stearns and Scotiabank. He was the first witness to cooperate with the government's investigation into spoofing at Scotiabank, and his immediate cooperation allowed the government to build its case, obtain search warrants, and analyze trade data efficiently, resulting in a substantial corporate resolution with Scotiabank just 15 months after Mr. Flaum's guilty plea.

IV.     Section 3553(a) Factors

To be clear, but for the defendant's complete acceptance of responsibility and immediate cooperation, the government would be advocating for a meaningful term of imprisonment in light of the § 3553(a) factors. The defendant's crime was serious, and the need for general deterrence here is great, but other factors weigh heavily in favor of leniency, including the need to avoid unwarranted sentencing disparities.

First, the defendant's crime was serious. Mr. Flaum manipulated the precious metals markets for his own gain, causing other market participants to lose approximately $3.35 million. The crime was long-running and involved core U.S. financial markets. However, unlike the traders that Mr. Flaum testified against in the Smith case, he was not a supervisor on the precious metals desk at Bear Stearns or Scotiabank, nor did he teach junior traders how to engage in spoofing. In fact, Mr. Flaum learned how to spoof by watching Mr. Smith as they sat together on the precious metals desk at Bear Stearns (and then later testified about that fact at trial against Mr. Smith).

Second, the government feels strongly there is a need to promote general deterrence in white-collar cases. Market manipulation is an under-prosecuted crime, and any sentence

imposed in a manipulation case must send a clear message to deter others from toying with this nation's public markets. But at the same time, there also is a clear need in complex white-collar cases to incentivize the speedy acceptance of responsibility and cooperation that Mr. Flaum has demonstrated here. It would be difficult to prosecute complicated trading cases without cooperating witnesses to decode jargon, explain the trading at issue, and provide first-hand knowledge of the inner workings of the scheme.

Third, the government does not believe there is a need to specifically deter Mr. Flaum from future misconduct. He does not have any other criminal history. Moreover, he accepted responsibility, cooperated immediately with the government, and complied completely with his conditions of presentence release. Based on the facts known to the government, the defendant poses no risk of recidivism. To the contrary, Mr. Flaum's efforts toward rehabilitation and leading a crime-free life over the past four years are commendable.

Fourth, Mr. Flaum's personal history and characteristics, which are detailed in the PSR and in the letters submitted on his behalf, are significant mitigating factors. In addition, in the government's view, the strength of Mr. Flaum's character was demonstrated by his decision to immediately cooperate with the government's investigation and to persist in that cooperation— even given its unusual duration lengthened by trial delays in the Smith case caused by the coronavirus pandemic—without complaint.

Fifth, a lenient sentence would avoid unwarranted sentencing disparities. The two other cooperating witnesses in the Smith case who testified in the government's case-in-chief in addition to Mr. Flaum (Mr. Edmonds and Mr. Trunz) both received non-custodial sentences. See Judgment, United States v. Edmonds, 18 CR 239, ECF No. 57 (D. Conn. June 15, 2023) (time served, one year of supervised release, $25,000 fine, and 100 hours of community service); Judgment, United States v. Trunz, 19 CR 375 (WFK), ECF No. 27 (E.D.N.Y. June 29, 2023) (time served). And the two defendants convicted in Smith each were sentenced to a term of incarceration along with a monetary fine. See Smith, 19 CR 669, ECF Nos. 925 & 927 (N.D. Ill. Aug. 31, 2023) (Smith sentenced to 24 months' incarceration and $50,000 fine; Nowak sentenced to one year and one day incarceration and $35,000 fine).

A lenient sentence for Mr. Flaum would also be consistent with the sentences given to similarly situated cooperating defendants in other spoofing cases who engaged in similar conduct. In a recent prosecution involving spoofing by precious metals traders at Deutsche Bank, the two senior traders who were convicted after a trial were sentenced to a year and a day in prison, see United States v. Vorley, 18 CR 35 (N.D. Ill.), while the junior trader who testified at trial as a cooperating witness received a probationary sentence, see United States v. Liew, 17 CR 1 (N.D. Ill.). Other defendants who pleaded guilty and cooperated with the government's investigation in spoofing cases typically have been sentenced to probation or time served.[4] See Judgment, United States v. Sarao, 15 CR 75, ECF No. 119 (N.D. Ill.) (time served, one-year home confinement);

---

[4] The government recognizes that these cases involved defendants who were sentenced outside of this District and Circuit. However, the Second Circuit has explained that § 3553(a)(6)'s direction to avoid unwarranted sentence disparities focuses on "nationwide sentence disparities." United States v. Ghailani, 733 F.2d 29, 55 (2d Cir. 2013).

Judgment, United States v. Zhao, 18 CR 24, ECF No. 72 (N.D. Ill.) (time served); Judgment, United States v. Mohan, 18 CR 610, ECF No. 56 (S.D. Tex.) (1 year probation) but see Judgment, United States v. Gandhi, 18 CR 609, ECF No. 86 (S.D. Tex.) (24 months' imprisonment).[5]

Sixth, regarding the need to provide restitution to any victims of the offense, the offense of conviction in this case is under Title 7 of the United States Code, and therefore restitution is permissive under 18 U.S.C. § 3663, and not mandatory under 18 U.S.C. § 3663A. See 18 U.S.C. § 3663A(c)(1)(A)(ii) (stating restitution is mandatory only for "an offense against property under this title"). In addition, any restitution arising from the defendant's offense conduct at Scotiabank has been satisfied in full by payment of victim compensation pursuant to the bank's deferred prosecution agreement with the United States. See DPA ¶ 15, United States v. The Bank of Nova Scotia, 20 CR 707, ECF No. 2 (D.N.J. Aug. 19, 2020); see also 18 U.S.C. § 3664(h).

* * *

---

[5] In Gandhi, the defendant had pleaded guilty to two counts of conspiracy relating to two separate spoofing conspiracies. Based on the defendant's substantial assistance, which involved a corporate resolution with the defendant's former trading firm where he engaged in spoofing, but no trial testimony, the government moved for a downward departure under § 5K1.1, and the Court departed downward significantly from a Sentencing Guidelines range of 87 to 108 months.

V.  Conclusion

For the foregoing reasons, the government moves the Court to depart downward significantly pursuant to § 5K1.1 of the Sentencing Guidelines and respectfully requests that the Court impose a sentence upon the defendant that reflects his significant cooperation and the mitigating factors under § 3553(a), specifically, a sentence that does not include a term of incarceration.

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:  /s/*Matthew F. Sullivan*
Matthew F. Sullivan
Lucy B. Jennings
Christopher Fenton
1400 New York Avenue NW
Washington, DC 20005
(202) 578-6583
matthew.sullivan2@usdoj.gov

cc:  Clerk of the Court (BMC) (by ECF & Email)
Nick Lewin & Jonathan Bolz (by ECF & Email)
Darren P. Galerkin, United States Probation Officer (by Email)